# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS

### CORPUS CHRISTI DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| In re | ) | Chapter 15 |
| | ) | |
| Metrofinanciera, S.A.P.I. de C.V., Sociedad | ) | Case No. 10-20666 |
| Financiera de Objeto Múltiple, E.N.R., | ) | |
| | ) | |
| Debtor in a Foreign Proceeding. | ) | |
| | ) | |

**FOREIGN REPRESENTATIVE'S CONSOLIDATED**
**<u>OPENING MEMORANDUM REGARDING THIS CASE</u>**

# <u>TABLE OF CONTENTS</u>

I. Introduction ................................................................................................................1

II. Overview of Metrofinanciera's Business and Events Leading to the Mexican Proceeding4

III. The Mexican Proceeding ........................................................................................6

    A. The Convenio ...............................................................................................9

IV. Connections to the United States ..........................................................................12

V. Venue and Jurisdiction.........................................................................................14

VI. Case Administration under Chapter 15 of the Bankruptcy Code .......................15

VII. Policies of Chapter 15 of the Bankruptcy Code and Principles of Comity ......16

VIII. The Mexican Proceeding Should be Recognized as a Foreign Main Proceeding ...........23

    A. The Mexican Proceeding Is a Foreign Main Proceeding........................23

    B. José Angel Amaro Is a Person Within the Meaning of Section 1517(a)(2) of the Bankruptcy Code ....................................................................................26

    C. The Petition Meets the Requirements of Section 1515 of the Bankruptcy Code ..27

IX. Upon Recognition of the Mexican Proceeding, the Debtor Is Entitled to Relief under 11 U.S.C. § 1520...............................................................................................29

X. A Temporary Restraining Order and Preliminary Injunction Enjoining Collection Actions against Metrofinanciera in the United States Pending the Court's Ruling on the Verified Petition Should be Granted ............................................................................29

    A. The Procedural Requirements for Injunctive Relief Are Satisfied .......32

        (i) Success on the Merits Is Likely .............................................32
        (ii) Metrofinanciera Will Face Irreparable Harm Absent the Requested Relief33
        (iii) Non-Moving Parties are Not Likely to be Harmed..................34
        (iv) Interim Injunctive Relief Is Consistent with U.S. Public Policy ..............35

    B. The Requirements for a Temporary Restraining Order Are Satisfied .................36

XI. Additional Assistance to Implement the Convenio in the United States is Authorized under Chapter 15 of the Bankruptcy Code and the Principles of Comity ........................37

    A. Additional Assistance Is Authorized under Section 1507 of the Bankruptcy Code37

    B. Post-Recognition Relief Is Guided by Principles of Comity ................................39

    C. Principles of Comity in Chapter 15 Cases Support Entry of an Order Granting the Additional Assistance Requested in this Chapter 15 Case ....................................44

        (i) The Mexican Proceeding Is Akin to a Chapter 11 Proceeding under the Bankruptcy Code, and Therefore, Is Consistent with the Fundamental Principles of Procedural Fairness and Public Policy of the United States.45
        (ii) The Convenio Is Also Consistent with the Fundamental Principles of Procedural Fairness and Public Policy of the United States.....................46

(iii)    Additional Assistance Requested Herein Promotes Fundamental Policies
of the Bankruptcy Code ..........................................................................48

D.    Enforcement of the Exchange Provided under the Convenio Is Also Authorized
under 11 U.S.C. § 1521(b) .................................................................................49

XII.    Need for the Securities Custodian to Expeditiously Implement the Exchange ................50

Petitioner, José Angel Amaro (the "Petitioner"), as the authorized foreign representative of Metrofinanciera, S.A.P.I. de C.V., *Sociedad Financiera de Objeto Múltiple, Entidad No Regulada* ("Metrofinanciera" or the "Debtor") in a voluntary restructuring proceeding (the "Mexican Proceeding") currently pending in the United Mexican States ("Mexico"), by and through his undersigned counsel, respectfully submits this memorandum as an overview of the law and facts pertinent to this case and as further support for its: (1) *Verified Petition for Recognition as a Foreign Main Proceeding and Request for Related Relief* (the "Verified Petition"); (2) *Emergency Motion of Foreign Representative for a Preliminary Injunction and Temporary Restraining Order Prohibiting Collection Actions Against the Debtor in the United States* (the "TRO Motion"); (3) *Foreign Representative's  Motion for an Order Granting Additional Assistance and Other Appropriate Relief to the Foreign Representative* (the "Motion for Additional Assistance"); and (4) the *Motion for Provisional Appointment of Robert C. Pate as a Custodian in the United States* (the "Custodian Motion").  The Verified Petition, the TRO Motion, Motion for Additional Assistance, and the Custodian Motion, along with certain supporting declarations,[1] are filed contemporaneously herewith.

## I.   Introduction

Metrofinanciera is a subprime and construction lender based in Monterrey, Mexico and operates solely in Mexico.  Metrofinanciera has not conducted business in the United States, and Metrofinanciera has as its only assets in the United States the retainer account fees for services to be rendered on behalf of Metrofinanciera by its United States lawyers located in the Corpus Christi Division of the Southern District of Texas and the agreement and retainer paid to Robert C. Pate as the proposed Securities Custodian (pursuant to the Securities Custodian Motion

---

[1]      The supporting declarations include: (1) the Declaration of José Angel Amaro Pursuant to 28 U.S.C. § 1746 (the "Amaro Declaration") and (2) the Declaration of Eugenio Sepúlveda Pursuant to 28 U.S.C. § 1746 (the "Sepúlveda Declaration").

described below) also located in the Corpus Christi Division of the Southern District of Texas. Accordingly, venue is proper inasmuch as Metrofinanciera has its only assets, for the greater part of 180 days prior to this petition, in the Corpus Christi Division of the Southern District of Texas.

The Debtor filed a prepackaged insolvency proceeding under Mexican law on August 13, 2009 and has since confirmed a plan of reorganization – or "Convenio" – restructuring over US$880 million of debt.  The Debtor has commenced this chapter 15 case to implement its restructuring in the United States.  This chapter 15 case is necessary because the Debtor has U.S. creditors, and non-U.S. creditors who have rights under U.S. law, and hopes to ensure that U.S. courts will give effect to its restructuring plan and protect the Debtor from collection and other suits filed in the United States on account of its prepetition debt.  Further, implementing the Convenio through U.S. courts will also assure that U.S. creditors receive the consideration that they are due under the Convenio without having to further appear in the Mexican Proceeding.

More specifically, prior to its insolvency proceedings in Mexico, Metrofinanciera issued and sold US$100 million of perpetual non-cumulative subordinated 11.25% step-up notes (the "Perpetual Notes").  The Bank of New York Mellon ("BNYM")[2] is the indenture trustee for the holders of the Perpetual Notes.  Pursuant to the terms of the Perpetual Notes indenture agreement dated April 24, 2006 (the "Indenture"), New York courts have jurisdiction over actions brought in connection to the Perpetual Notes.  To the best of Petitioner's knowledge, U.S. holders of the Perpetual Notes are Metrofinanciera's only U.S. creditors.

In June 2009, Metrofinanciera sought to restructure its debt under Mexican law pursuant to a prepackaged plan of reorganization negotiated among the Debtor and its various creditors.

---

[2]      All references to BNYM herein, unless otherwise noted, solely refer to BNYM in its capacity as indenture trustee for the holders of the Perpetual Notes and do not refer to BNYM in its individual capacity or as trustee for any other Mexican trust.

Once the Debtor obtained sufficient creditor support for its prepackaged plan, Metrofinanciera commenced its insolvency proceedings in Mexico under Mexican restructuring laws. BNYM appeared and participated in the Mexican Proceeding on behalf of the holders of the Perpetual Notes. BNYM did not object to the Convenio. In addition, BNYM filed a proof of claim in respect to the Perpetual Notes that was ultimately allowed. In June of 2010, the Convenio was confirmed by a Mexican federal court with the support of 68.5% of Metrofinanciera's qualified creditors.

The Convenio embodies a consensual agreement among the Debtor's creditors that abides by fundamental standards of procedural fairness and is consistent with U.S. public policy. Among other things, the Convenio is the result of arms' length negotiations among the Debtor's creditor constituencies, conforms to the distribution priorities generally applicable in cases under the Bankruptcy Code and was confirmed only after all creditors were given the opportunity to object. The Debtor requests relief under chapter 15 to give effect to its restructuring in the United States. Absent such relief, the Debtor will have no guarantee that it will not be sued by its creditors in the United States even after they receive the consideration required by the Convenio, especially given New York courts' jurisdiction over all actions brought in connection to the Perpetual Notes. Thus, implementation of the Convenio in the United States through this case is necessary to provide the Debtor with the fresh start to which it is entitled under both Mexican and U.S. law.

II.     **Overview of Metrofinanciera's Business and Events Leading to the Mexican Proceeding**[3]

1.      Metrofinanciera is a non-bank multiple purpose finance company (*sociedad financiera de objeto múltiple* or *Sofom*) that has provided mortgage loans to homebuyers and construction loans to housing developers in Mexico since 1997. Metrofinanciera's registered office and principal place of business is located in Monterrey, Mexico.  The United States courts closest to the Debtor's principal place of business are located in the Southern District of Texas.

2.      Prior to the commencement of the Mexican Proceeding, Metrofinanciera offered a wide variety of mortgage products tailored to the specific needs of its customers.  The principal products offered by Metrofinanciera were (i) fixed interest rate mortgage loans provided primarily to lower-income individuals, and (ii) floating interest rate construction loans provided to housing developers and contractors to finance the purchase of undeveloped residential land, as well as the construction and development of residential housing.   Metrofinanciera also provided certain other real estate services, such as appraisal services and credit investigations, to its customers and third parties.

3.      Metrofinanciera's financial troubles can be traced to four distinct causes. First, Metrofinanciera engaged in a number of business practices apparently prevalent in the North American mortgage industry during the housing boom that lessened the value of its loan portfolio.  Among other things, Metrofinanciera: extended unsecured construction loans with loan-to-value ratios that were too low (contrary to its corporate policy); failed to secure certain of its mortgage loans with collateral by committing documentation and other errors; did not regularly collect interest payments from its borrowers; extended credit based on improper

---

[3]        This section provides an overview of Metrofinanciera's business and operations.  A more detailed discussion of the company can be found in the Verified Petition.

appraisals that overvalued the applicable properties; extended credit to borrowers without proper credit analysis; obtained loans in pesos and dollars for its own use at above-market interest rates; entered into loan modifications with its borrowers without good business reasons; and ceased funding numerous construction projects prior to their completion.

4.      Second, in order to fund its exponential growth and cash needs, Metrofinanciera began to divert loan proceeds payable to its securitization trusts to use for general corporate purposes and began to use funds from new securitization trusts to make up the difference.   This practice was unsustainable.

5.      Third, the crash of worldwide financial markets in September of 2008 severely impacted Metrofinanciera's ability to obtain further financing, further straining its operations.

6.      Fourth, on November 26, 2008, Metrofinanciera requested that its creditors voluntarily forebear from receiving payments for a period of ninety (90) days.  As a result, Standard & Poor's reduced Metrofinanciera's credit rating from a "B" to a "CCC" on November 27, 2008 based on its global scale and Moody's de Mexico reduced Metrofinanciera's credit rating from "B3" to "CAA2" on December 2, 2008 based on its Mexican scale.  Consequently, Metrofinanciera could no longer issue short-term commercial paper, which was critical to meeting its cash needs.

7.      Recognizing the need to restructure its financial obligations and the costs and uncertainty of doing so inside a bankruptcy, Metrofinanciera began negotiations with its creditors to consensually restructure its financial affairs through a case under Mexico's Concurso Law.  Such negotiations were carried out on an arms' length basis and involved all of the Debtor's creditor constituencies, including the securitization trusts, secured creditors and general unsecured creditors.

8.      In order to obtain maximum credibility with its creditors, all but one of the members of Metrofinanciera's board of directors and the Debtor's director general were removed.  New board members and top management were appointed to restructure the Debtor.  Ultimately, the Debtor was able to reach a restructuring agreement with all its creditors' groups and proceed with a prepackaged bankruptcy proceeding under the Concurso Law.

## III.   The Mexican Proceeding

9.      The Concurso Law does not provide for automatic relief upon the filing of a petition.[4]  Rather, a judge must find that the debtor is both a business entity and has, in general, ceased making payments to creditors in order for relief to be granted.  There is, however, one exception to this rule.  The Concurso Law permits a debtor to negotiate a prepackaged bankruptcy plan of reorganization and commence a concurso proceeding thereafter and without establishing insolvency if creditors holding at least forty percent (40%) of its outstanding indebtedness have agreed to the plan and the filing of the petition.  The prepackaged plan submitted by a debtor with its concurso petition is referred to as a "preliminary plan," and, once concurso proceedings have been initiated, the debtor must then obtain the support of at least 51% of its "qualified indebtedness" to confirm a "final plan," which may or may not include some modifications from the preliminary plan.[5]

10.     Here, Metrofinanciera negotiated a prepackaged plan of reorganization with its various creditor constituencies and obtained the support of creditors representing approximately sixty-four percent (64%) of Metrofinanciera's qualifying indebtedness, well in excess of the forty percent required by the Concurso Law.  On August 13, 2009 (the "Mexican Petition Date"),

---

[4]      A detailed discussion of the Concurso Law is set forth in the Sepúlveda Declaration filed concurrently herewith.

[5]      The qualified indebtedness is the sum of claims held by (i) all holders of Secured Claims and holders of Claims with Special Privilege (each as defined below) that signed the Convenio; plus (ii) all Unsecured Creditors (as defined below), regardless of whether they signed the Convenio.

Metrofinanciera initiated the Mexican Proceeding by filing a voluntary petition (the "Mexican Petition") in the Federal District Court sitting in Monterrey, Nuevo León, Mexico, which turned to the Fourth Court of Civil and Labor Matters in the State of Nuevo León (*Juzgado Cuarto de Distrito en Materia Civil y de Trabajo en el Estado de Nuevo León*) (the "Mexican Court"), a Mexican federal court sitting in Monterrey, Nuevo León, Mexico.  Metrofinanciera's filing was the first prepackaged bankruptcy in Mexican history.

11.     On September 11, 2009, the Mexican Court rendered a final judgment, *sentencia de concurso mercantil*, declaring that Metrofinanciera was "*en concurso*" (the "Concurso Judgment").[6]  This is akin to the entry of an order for relief under the Bankruptcy Code.

12.     Shortly thereafter, the Mexican Court gave notice of the Concurso Judgment to the *Instituto Federal de Especialista en Concurso Mercantiles* (the "Institute") which appointed Mr. Victor Manuel Aguilera Gomez to act as the conciliador (the "Conciliador").  Under the Concurso Law, a debtor remains in possession of its assets while the subject of a concurso proceeding.  However, a "conciliador" is appointed by the court to perform several ministerial and administrative functions.  First, the conciliador acts as a mediator to help the various parties reach agreement with respect to a plan of reorganization.  The conciliador cannot force an agreement.  He can only mediate.  Next, the conciliador is responsible for verifying the list of creditors submitted by the debtor with its bankruptcy petition, preparing a preliminary and then a definitive list of creditors for the court to consider and notifying creditors of the concurso proceedings.

13.     In accordance with Concurso Law, the Conciliador caused the Concurso Judgment to be published in the "*Diario Oficial de la Federación*" on October 21, 2009.  The

---

[6]     True and correct copies of the Concurso Judgment and the Convenio Order and English translations thereof are attached to the Amaro Declaration.

*Diario Oficial de la Federación* is the official method for providing notice of federal proceedings under Concurso Law.  The Conciliador also sent a notice of the Concurso Judgment to The Bank of New York Mellon ("BNYM"), indenture trustee for the Perpetual Notes, on November 5, 2009, pursuant to Article 291 of the Concurso Law, which is the substantial equivalent to section 1514 of the Bankruptcy Code.

14.    Additionally, Metrofinanciera engaged in its own efforts to provide notice to its creditors.  Among other things, Metrofinanciera published notice on its website at http://www.metrofinanciera.com.mx/ConcursoMercantil.aspx, which provided a letter to creditors of Metrofinanciera (the "Letter to Creditors") and an acknowledgement of credits request form (*solicitud de reconocimiento de créditos*)  (the "Acknowledgement of Credits Request Form") in Spanish and in English.[7]  The Letter to Creditors provided notice that the Mexican Proceeding had commenced and that the Conciliador had been appointed, and encouraged all parties holding claims against Metrofinanciera to submit completed Acknowledgement of Credits Request Forms to the Conciliador for purposes of compiling an accurate list of claims.

15.    As required by the Concurso Law, creditors with Mexican domiciles were given twenty (20) days after the publishing of the Concurso Judgment to file claims and foreign creditors were given forty-five (45) days.

16.    On November 10, 2009, BNYM filed an Acknowledgment of Credits Request Form for claims arising from the Perpetual Notes in the amount of US$111,157,995 (US$100,000,000 for the principal value of the Perpetual Notes and US$11,156,250 for accrued and outstanding interest and US$1,745 for outstanding fees to BNYM).  BNYM's claim was

---

[7]    Under the Concurso Law, a *solicitud de reconocimiento de créditos* is akin to a U.S. proof of claim.

recognized and acknowledged as an Other Unsecured Claim (as defined below) only in the amount of the principal value of the Perpetual Notes – US$100,000,000.  BNYM did not appeal the allowed amount of the claims relating to the Perpetual Notes.

17.     Metrofinanciera, with the support of the Conciliador, continued to negotiate with creditors, including those that had not yet accepted the prepackaged plan, even after Metrofinanciera was placed into concurso.  Eventually, 68.5% of Metrofinanciera's qualified outstanding indebtedness supported the Convenio.

18.     Further, the Concurso Law provides an opportunity for creditors to object to (veto) the Convenio.  No objections (vetoes) were filed with respect to the Convenio.

19.     On June 8, 2010, the Mexican Court entered an order approving the Convenio (*sentencia de aprobación de convenio*) (the "Convenio Order").  Three creditors (which were unhappy with the allowed amounts of their claims and disputed whether certain assets were property of the estate) appealed the Convenio Order; Metrofinanciera's concurso proceedings will remain pending until such appeal is resolved.  These appeals temporarily stayed the Convenio Order, however, the stay has since been dissolved and, currently, the Convenio is ready for implementation.  The Convenio Order and the Concurso Law fully authorize Metrofinanciera to implement the Convenio.

A.     *The Convenio*

20.     The confirmed Convenio embodies a consensual agreement among the Debtor's creditors that abides by fundamental standards of procedural fairness and is consistent with United States public policy.  Among other things, the Convenio is the result of arms' length negotiations among the Debtor's creditor constituencies, generally conforms to the distribution priorities generally applicable in cases under the Bankruptcy Code and was confirmed only after all creditors were given the opportunity to object to or "veto" the Convenio.

21.     The Convenio restructures over US$880 million of the Debtor's financial indebtedness and identifies three main types of claims:  (1) "Claims with Collateral," akin to "Secured Claims" in the United States; (2) "Claims with Special Privilege," which have statutory priority over general unsecured claims and are akin to priority claims in the United States; and (3) "Regular Claims," akin to "Unsecured Claims" in the United States.  This last class of claims is divided into two different groups:  "Securitization Claims," which arise from the diversion of securitization loan proceeds by the Debtor; and "Other Unsecured Claims," which include all other remaining general unsecured claims.

22.     The Convenio also recognizes "Claims Against the Estate" (*creditos contra la masa*),[8] which include labor, professional services, post-commencement (i.e., debtor-in-possession) financing and similar administrative expenses.

23.     There are approximately US$260 million of Secured Claims; US$312 million of Claims with Special Privilege; US$367 million of Securitization Claims; US$518 million of Other Unsecured Claims; and US$12 million of Claims Against the Estate.

24.     The Convenio provides that holders of Secured Claims and Claims with Special Privilege will either be unimpaired and paid according to their respective contracts, or be allowed to take title of their collateral in full satisfaction of such claims.  The Convenio also provides that Claims Against the Estate are to be paid in full in the ordinary course of business.

25.     The Securitization Claims and Other Unsecured Claims will be satisfied by exchanging such claims (the "Exchange") for a mix of:  (a) common stock in the reorganized Metrofinanciera; (b) subordinated notes (the "Subordinated Notes") that (i) accrue interest at 4% per annum, capitalized quarterly, (ii) mature in 2020 (iii) can be involuntarily be converted into

---

[8]     Under the Concurso Law, *creditos contra la masa* are akin to administrative claims under U.S. bankruptcy law.

equity if the Debtor does not maintain certain capital ratios set forth in the Convenio and (iv) can be voluntarily converted to equity by the holders subject to certain limits; and (c) non-subordinated, cash-pay notes (the "Non-Subordinated Notes") that accrue interest at the *Tasa de Interés Interbancaria de Equilibrio* rate (the Mexican prime rate) plus 1%.  Commencing in 2012, the principal in respect of the Non-Subordinated Notes is payable in quarterly installments equal to 1.25% of the original principal amount of such notes.  All remaining unpaid principal (i.e., 65% of the principal) is due in 2020.

26.     Securitization Creditors will receive: (a) 24.70% of the allowed amount of their claim in common stock in the reorganized Metrofinanciera; (b) 36.70% of the allowed amount of their claim in Subordinated Notes; and (c) 38.60% of the allowed amount of their claim in Non-Subordinated Notes.  Other Unsecured Creditors will receive: (a) 49.00% of the allowed amount of their claim in common stock of the reorganized Metrofinanciera; (b) 34.00% of the allowed amount of their claim in Subordinated Notes; and (c) 17.00% of the allowed amount of their claim in Non-Subordinated Notes.

27.     Each share of common stock has a par value of P$10.00, and is exchanged for an Unsecured Claim on a Peso-for-Peso basis.  The Subordinated Notes and the Non-Subordinated Notes are denominated in Pesos and are also exchanged for Unsecured Claims on a Peso-for-Peso basis.  Accordingly, for every P$10,000 of claims, a Securitization Creditor will receive (i) 247 shares with a cumulative par value of P$2,470, (ii) Subordinated Notes in the principal amount of P$3,670, and (iii) Non-Subordinated Notes in the principal amount of P$3,860.  For every P$10,000 of claims, an Other Unsecured Creditor will receive (i) 490 shares with a cumulative par value of P$4,900, (ii) Subordinated Notes in the principal amount of P$3,400, and (iii) Non-Subordinated Notes in the principal amount of P$1,700.

28.     The Convenio also provides, among other things, that each creditor that accepts the Convenio submits himself to the jurisdiction of the Mexican Court, and that each creditor and the Debtor must pay their own legal fees and expenses.[9]

## IV.     Connections to the United States

29.     Metrofinanciera has no business operations in the United States.  All of Metrofinanciera's business operations are located in Mexico.

30.     Metrofinanciera has agreed, and pursuant to an agreement, intends to nominate and seek appointment, with the Court's approval, of Robert C. Pate, who resides in Corpus Christi, Texas, as Metrofinanciera's custodian of certain Exchange securities allocated under the Convenio (the "Securities Custodian").  Additionally, Metrofinanciera has retained the law firm of Jordan, Hyden, Womble & Culbreth, P.C., as co-counsel for Meterofinanciera in the chapter 15 proceeding and deposited a retainer therewith.

31.     Metrofinanciera's only known U.S. creditors are those certain holders of Perpetual Notes located in the United States.  Metrofinanciera believes that such entities are a diverse group of banks, hedge funds and individual investors.   Metrofinanciera originally issued the Perpetual Notes in 2006.  Substantially all of the Perpetual Notes – 92 percent or US$92 million in the principal amount of the Perpetual Notes – were originally issued to non-U.S. persons.  The remaining 8 percent or US$8.0 million of Perpetual Notes was purchased by institutional buyers in the United States.

32.     Notwithstanding the fact that the vast bulk of the Perpetual Notes were issued to non-U.S. persons, over time, some of the Perpetual Notes originally placed outside of the United

---

[9]     A new board consisting of three directors has already been appointed.  One director was appointed by a Mexican governmental agency that guaranteed many of the mortgages made by and to Metrofinanciera and is a large secured creditor.  A second director was chosen by holders of Securitization Claims, and a third director was selected by holders of Other Unsecured Claims.

States were purchased by U.S. investors in over-the-counter or dealer-to-dealer transactions. Such "flow back" to U.S. investors occurred without any action, knowledge or participation of the Debtor.

33.     As stated above, the Convenio recognized the claims filed by BNYM on behalf of the holders of Perpetual Notes in the amount of US$100 million and classified those claims as Other Unsecured Claims.  Accordingly, they will be treated as such under the Convenio. Further, the Convenio treats U.S. holders of Perpetual Notes exactly like the Mexican and all other holders of Perpetual Notes are treated.

34.     Although BNYM was noticed of the Mexican Proceeding by the Conciliador, neither BNYM nor any of the holders of Perpetual Notes objected to (vetoed) the Convenio. Further, no holder of Perpetual Notes objected to the amount of Perpetual Note claims ultimately allowed by the Conciliador.

35.     Pursuant to the Indenture, BNYM or any other holder of Perpetual Notes, whether or not located in the United States, may take action against Metrofinanciera in New York courts. Indenture § 12.14.  The Indenture authorizes BNYM to take such action on its own initiative.  Id. at §§ 5.3, 5.4.  Upon information and belief, no such action has been taken.  Further, holders of Perpetual Notes holding more than twenty five percent (25%) of the aggregate principal amount of the Perpetual Notes may direct the indenture trustee to exercise such remedies.[10]  Id. at § 5.11. And, holders of Perpetual Notes may exercise remedies on their own behalf if the indenture trustee refuses to do so after proper instruction.  Id.  Hence, there is no assurance that Metrofinanciera will not be sued in the future in New York courts notwithstanding the approval of the Convenio in the Mexican Proceedings.  Such actions would significantly disrupt

---

[10]     The threshold percentage requirements may be further relaxed because certain limitations on suits may not apply to individual Perpetual Note Holders in case of a concurso or other bankruptcy proceeding.  Indenture § 5.6.

Metofinanciera's operations and the implementation of the Convenio and make distributions and protection of the distribution rights of this class problematic.  Recognition is necessary to eliminate this risk and effect the terms of the Convenio in the United States in a manner consistent with Mexican law and the laws of the United States.

## V.    <u>Venue and Jurisdiction</u>

36.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.

37.    Venue is proper in this district.  Section 1410 of title 28 of the United States Code provides as follows:

> A case under chapter 15 of title 11 may be commenced in the district court of the United States for the district —
>
> (1)    in which the debtor has its principal place of business or principal assets in the United States;
>
> (2)    if the debtor does not have a place of business or assets in the United States, in which there is pending against the debtor an action or proceeding in a Federal or State court; or
>
> (3)    in a case other than those specified in paragraph (1) or (2), in which venue will be consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative.

28 U.S.C. § 1410; H.R. Rep. No. 109-31, 1st Sess. 119 ("The venue provisions for cases ancillary to foreign proceedings . . . provide a hierarchy of choices beginning with principal place of business in the United States, if any.  If there is no principal place of business in the United States, but there is litigation against a debtor, then the district in which the litigation is pending would be the appropriate venue.  In any other case, venue must be determined with reference to the interests of justice and the convenience of the parties.").

38. The Petitioner intends to nominate and seek appointment of Robert C. Pate, who resides in Corpus Christi, Texas, as the Securities Custodian.  Further, Metrofinanciera has retained the law firm of Jordan, Hyden, Womble & Culbreth, P.C. to represent it in these proceedings and has paid such firm a $30,000 retainer.

39. Also, in light of its proximity to Monterrey, Mexico, the Debtor's principal place of business, and its accessibility to its American creditors, the Southern District of Texas would be a venue consistent with interests of justice and the convenience of the parties.

40. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

**VI.   Case Administration under Chapter 15 of the Bankruptcy Code**

41. The procedural requirements and administration of a case under chapter 15 of the Bankruptcy Code differ from the requirements and case administration under plenary cases. Many of the administrative and procedural requirements of a chapter 11 case are not imposed on a chapter 15 debtor, in particular as needlessly duplicative and inefficient.  Among other things, there is no need to hold a creditors meeting under section 341, there is no requirement for professionals of the debtor to file retention applications (sections 327-329), and there are no reporting requirements under section 308 (but there are certain limited reporting requirements under section 1518).  Notice to creditors and parties-in-interest is prescribed in section 1514, and section 342 does not apply.

42. Section 103 of the Bankruptcy Code provides that only "[chapter 1], sections 307 [(role of the United States Trustee)], 362(n) [(dealing with the automatic stay as applied in certain small business contexts)], 555 through 557 [(certain financial contract safe harbor provisions)], and 559 through 562 [(certain other financial contract safe harbor provisions)] apply in a case under chapter 15."  11 U.S.C. § 103.

43.     Throughout chapter 15, however, certain sections also incorporate and refer to the relief provided in sections other than those specifically provided in section 103.  For instance, an examiner may be appointed in accordance with section 1104(d), and must comply with the qualification requirements imposed on a trustee by section 322.  11 U.S.C. § 1522(d).  A chapter 15 case is closed in accordance with section 350.  11 U.S.C. § 1517(d).

44.     Many of the administrative powers of chapter 3, such as adequate protection, the automatic stay and the use, sale or lease of property, also only have some application in chapter 15.  See 11 U.S.C. §§ 1519-1521.  For instance, under section 1520(a), only upon recognition of the foreign proceeding as a foreign main proceeding is the automatic stay applied and while the foreign representative may operate the debtor's business and may exercise the rights and powers of a trustee under and to the extent provided in sections 363 and 552, sections 363, 549 and 552 only apply to a transfer of an interest of the debtor-in-property that is within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of an estate.  11 USC § 1520(a)(1)-(3).

## VII.   Policies of Chapter 15 of the Bankruptcy Code and Principles of Comity

45.     The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") enacted chapter 15 of the Bankruptcy Code to replace former section 304 of the Bankruptcy Code.  Chapter 15 incorporates and implements the United Nations Commission on International Trade Law ("UNCITRAL") Model Law on Cross-Border Insolvency (the "Model Law").  Fogerty v. Petroquest Resources, Inc. (In the Matter of Condor Insurance Ltd.),  601 F.3d 319, 321 (5th Cir. 2010); see also Lavie v. Ran (In the Matter of Ran), 607 F.3d 1017, 1020 (5th Cir. 2010); 8 COLLIER ON BANKRUPTCY ¶ 1501.01.  Due to its international origins, chapter 15 is interpreted in coordination with the interpretation given by other countries that have adopted it as internal law to promote a uniform and coordinated and legal regime for cross-

border insolvency cases.  See 11 U.S.C. § 1508 ("[i]n interpreting this chapter, the court shall

consider its international origin, and the need to promote an application of this chapter that is

consistent with the application of similar statutes adopted by foreign jurisdictions."); see also

H.R. Rep. No. 109-31, 1st Sess. 106 (2005) ("[Chapter 15] incorporates the Model Law on

Cross-Border Insolvency to encourage cooperation between the United States and foreign

countries with respect to transaction insolvency cases").  Mexico is among the countries that

have adopted the Model Law.  Thus, the Concurso Law incorporates the Model Law.

46.     The purpose of chapter 15, and the Model Law on which it is based, is to provide

effective mechanisms for dealing with insolvency cases involving more than one country.  See 8

COLLIER ON BANKRUPTCY ¶ 1501.01.  Given the increasing incidence of cross-border

insolvencies that follow continuing globalization of trade and investment, chapter 15 addresses

the need for domestic insolvency laws to deal predictably with cross-border cases.  See H.R.

Rep. No. 109-31, 1st Sess. 106 (2005).  Section 1501(a) of the Bankruptcy Code sets forth five

objectives of the chapter:

> (1) cooperation between –
>
>> (A) courts of the United States, United States trustees, trustees, examiners, debtors, and debtors-in-possession; and
>>
>> (B) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;
>
> (2) greater legal certainty for trade and investment;
>
> (3) fair and efficient administration of cross-border insolvencies that protect the interests of all creditors, and other interested entities, including the debtor;
>
> (4) protection and maximization of the value of the debtor's assets; and
>
> (5) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

11 U.S.C. 1501(a).

47.     Chapter 15 cases are intended to be supplementary or ancillary when there is a foreign main proceeding that comprehensively administers the restructuring of a foreign debtor. H.R. Rep. No. 109-31 at part I ("Cases brought under chapter 15 are intended to be ancillary to cases brought in a debtor's home country, unless a full United States bankruptcy case is brought under another chapter.").

48.     Like the Model Law, chapter 15 seeks to reconcile three related concepts in an ancillary case:  recognition of foreign insolvency proceedings; access to judicial proceedings in the United States by duly appointed foreign representatives of foreign proceedings; and availability of specified relief upon recognition of the foreign proceeding.  8 COLLIER ON BANKRUPTCY ¶ 1501.01.  "Relief is designed to protect the interests of the debtor and its creditors in an orderly administration of the bankruptcy estate and to promote fairness for both local and foreign creditors."  Id.  Chapter 15 is divided into several subchapters that address general provisions, access of foreign representatives and creditors to courts in the United States, recognition of foreign proceedings and relief, cooperation with foreign courts and foreign representatives and coordination of concurrent proceedings.  Id.

49.     Under chapter 15, the decision to grant recognition of a foreign proceeding is not dependent upon any findings about the nature of the foreign proceedings of the sort previously mandated by former section 304(c) of the Bankruptcy Code, predecessor to chapter 15.  H.R. Rep. No. 109-31, 1st Sess. 113.  Recognition of a foreign main proceeding is required when the proceeding is pending in the country where the debtor has its center of main interests.  11 U.S.C. § 1517.

50.     Sections 1519 through 1521 detail the relief that may be granted upon the filing of a petition for recognition, the effects of recognition and the relief that may be granted upon

recognition.  See 11 U.S.C. §§ 1519-1521.  This relief includes, among other things, staying execution against the debtor's assets; the application of the automatic stay and granting of adequate protection of property of the debtor located in the U.S.; staying the commencement or continuation of proceedings concerning the debtors' assets, rights, obligations or liabilities; or "granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a)."  Id.; see also In the Matter of Ran, 607 F.3d at 1021 (citing 11 U.S.C. §§ 1520 and 1519(a)).  Bankruptcy courts also have jurisdiction to grant emergency relief under Bankruptcy Rule 7065 pending a hearing on the petition for recognition.  H.R. Rep. No. 109-31, 1st Sess. 114.  Furthermore, section 1519 does not expand or reduce the scope of section 105.  Id.

51.     In addition to the relief provided in sections 1519 through 1521, courts are authorized to grant additional assistance to a foreign representative under title 11 or other laws of the United States.  11 U.S.C. § 1507(a) (subject to the specific limitations stated in chapter 15).  The primary consideration for granting such additional assistance is whether such additional assistance would be consistent with the principles of comity.  11 U.S.C. § 1507(b); H.R. Rep. No. 109-31, 1st Sess. 109 ("Although the case law construing section 304 makes it clear that comity is the central consideration, its physical placement as one of six factors in subsection (c) of section 304 is misleading, since those factors are essentially elements of the grounds for granting comity.  Therefore, in subsection [(b)] of [section 1507], comity is raised to the introductory language to make it clear that it is the central concept to be addressed.").

52.     The principles of comity allow one nation to recognize within its territories the legislative, executive or judicial acts of another nation.  See In re Artimm, S.r.L., 335 B.R. 149, 161 (Bankr. C.D. Cal. 2005) (Comity is "the recognition which one nation allows within its

territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.").  "Comity takes into account the interests of the United States, the interests of the foreign states or states involved, and the mutual interests of the family of nations in just and efficiently functioning rules of international law."  Id.

53.     The Supreme Court decision in Canada Southern Railway Company v. Gebhard, 109 U.S. 527 (1883), clearly articulates the principles of comity.  Canadian railroad bonds were held by citizens of New York and payable in New York City.  The Canadian railroad that had issued such bonds defaulted, and requested that the bondholders accept a "scheme of arrangement" under which the railroad would issue new bonds with reduced terms in exchange for the old bonds.  This scheme was approved by large majorities of the holders of each issue of bonds and was enacted into law by the Canadian Parliament as binding on all holders of the bonds at issue.  Certain New York bondholders, who had not voted on this scheme nor participated in the selection of the committee that proposed the scheme, sued on their original bonds in New York.  The Canadian company defended by asserting that the scheme had redefined its obligations and was binding upon the U.S. parties.

54.     The Court held that the scheme bound the New York bondholders, and that their suit could not be maintained.  Id. at 539-40.  The Court premised its decision on the idea that the creditors' reasonable expectations should include the possibility that the laws of the issuer's home country might affect their legal rights.

> [E]very person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government, affecting the powers and obligations of the corporation with which he voluntarily contracts, as the known and established policy of that government authorizes. To all intents and purposes, he submits his contract with the corporation to such a policy of the foreign government, and whatever is done by that government in furtherance [ ] of that policy, which binds

those in like situation with himself, who are subjects of the government, in respect to the operation and effect of their contracts with the corporation, will necessarily bind him. He is conclusively presumed to have contracted with a view to such laws of that government, because the corporation must of necessity be controlled by them, and it has no power to contract with a view to any other laws with which they are not in entire harmony.

Id. at 537-38.

55.     Although the United States had no national bankruptcy laws at the time, the Court explicitly wrote in terms of a bankruptcy discharge, saying "anything done at the legal home of the corporation, under the authority of such laws, which discharges it from liability there, discharges it everywhere." Id. at 538. "Unless all parties in interest, wherever they reside, can be bound by the arrangement which it is sought to have legalized, the scheme may fail. All home creditors can be bound. What is needed is to bind those who are abroad. Under these circumstances the true spirit of international comity requires that schemes of this character legalized at home, should be recognized in other countries." Id. at 539.

56.     Comity has been stated to be "particularly appropriate and important with respect to foreign bankruptcy proceedings, where equitable principles demand that all claims against a debtor's limited assets be addressed in a single proceeding." Ecoban Finance Ltd. v. Grupo Acerero del Norte, S.A. de C.E., 108 F. Supp. 2d 349, 351-52 (S.D.N.Y. 2000) (dismissing creditors' action to collect on promissory notes and deferring to the pending Mexican bankruptcy proceeding under the principles of international comity); see also Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B., 825 F.2d 709, 713 (2d Cir. 1987) ("American courts have long recognized the particular need to extend comity to foreign bankruptcy proceedings."); In re Artimm, S.r.L., 335 B.R. 149 at 161 ("Deference to foreign insolvency proceedings will often facilitate the distribution of the debtor's assets in an equitable, orderly, efficient and systematic manner, rather than in a haphazard, erratic or piecemeal fashion."). Comity does not require that the foreign

proceedings afford creditors the identical protections that they would have under the U.S. Bankruptcy Code.  Argo Fund Ltd. v. Bd. of Dirs. of Telecom Argentina, S.A. (In re Bd. of Dirs. of Telecom Argentina, S.A.), 528 F.3d 162, 173 (2d Cir. 2008) (citing cases).

57.    Two recent cases highlight the extent to which courts are willing to recognize and enforce foreign insolvency-related judgments pursuant to the principles of comity, and provide additional assistance to implement terms of foreign plans.  In In re Metcalfe & Mansfield Alternative Investments, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010), the court granted post-recognition relief in the form of enforcement of non-debtor, third-party releases approved by Canadian courts as part of a restructuring plan that was adopted with near-unanimous creditor support, even though the court stated that it might not approve such a provision in a U.S. chapter 11 plan of reorganization.  The court rationalized its decisions on the basis of comity and that the third-party release provision was not manifestly contrary to U.S. policy.  Also, in In re Ephedra Products Liability Litigation, 349 B.R. 333, 335-37 (S.D.N.Y 2006), pursuant to the principles of comity and policies of chapter 15, the court recognized and enforced a claims resolution procedure ordered by an Ontario court even though the procedure arguably deprived parties of the constitutional right to a jury trial, which may have been required if such a procedure was originally approved in a U.S. court.

58.    The relief sought in Metrofinanciera's chapter 15 case, as summarized below, furthers the purpose and objectives of chapter 15 of the Bankruptcy Code and is consistent with the principles of international comity.

## VIII.   The Mexican Proceeding Should be Recognized as a Foreign Main Proceeding[11]

59.   Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, the Court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if (1) such foreign proceeding is a foreign main proceeding within the meaning of section 1502 of the Bankruptcy Code, (2) the foreign representative applying for recognition is a person or body and (3) the petition meets the requirements of section 1515 of the Bankruptcy Code. As set forth below and in the Verified Petition, the Mexican Proceeding and José Angel Amaro, the authorized foreign representative (the "Foreign Representative"), and the Verified Petition satisfy all of the foregoing requirements.

### A.   *The Mexican Proceeding Is a Foreign Main Proceeding*

60.   The Mexican Proceeding is a "foreign main proceeding" and, as such, satisfies the first condition for the entry of an order recognizing such proceeding under section 1517(a) of the Bankruptcy Code.

61.   As an initial matter, the Mexican Proceeding plainly comes within the general definition of "foreign proceeding" set forth in section 101(23) of the Bankruptcy Code, which states as follows:

> The term "foreign proceeding" means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

---

[11]      The arguments and legal analysis in this section are consistent with and conforms to the analysis set forth in the Verified Petition, but to the extent there are any inconsistencies, the Verified Petition shall control.

62.     Section 101(23) requires that a "foreign proceeding" (1) be a collective judicial or administrative proceeding relating to insolvency or adjustment of debt, (2) under the supervision of a foreign court and (3) for the purpose of reorganizing or liquidating the assets and affairs of the debtor.  See 11 U.S.C. § 101(23).  The statute defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding." 11 U.S.C. § 1502(3).

63.     Courts interpreting nearly identical requirements under former section 101(23), which pertained to ancillary proceedings under former section 304 of the Bankruptcy Code, have repeatedly recognized that the scope of the term "foreign proceeding" is broadly construed to include "all possible steps in an action from its commencement to the execution of judgment." See, e.g., In re Netia Holdings S.A., 277 B.R. 571, 582 (Bankr. S.D.N.Y. 2002) (holding that a bankruptcy proceeding commenced in Poland—which was in the "pre-opening" stage and, thus, not yet subject to an automatic stay in that country—constituted a "foreign proceeding" entitled to protection under the Bankruptcy Code); In re Fracmaster, Ltd., 237 B.R. 627, 632 (Bankr. E.D. Tex. 1999) (recognizing a Canadian receivership proceeding as "foreign proceeding" and stressing that "[t]he breadth of the definition of 'foreign proceeding' . . . encompasses administrative as well as judicial proceedings, and a proceeding need not even have been brought under the foreign country's bankruptcy laws in order to qualify.").  Further, section 1516(a) of the Bankruptcy Code entitles the court to presume that a foreign proceeding is a "foreign proceeding," if the decision commencing the foreign proceeding so states.  See 11 U.S.C. §§ 1516(a), 1515(b)(1).

64.     The Mexican Proceeding meets such criteria.  First, the Mexican Proceeding is (i) collective and is generally binding on creditors (see Concurso Law at arts. 65 et seq.); (ii) judicial (it is carried out before the Mexican Court, which is a court of a judicial nature (see id. at

art. 17)); and (iii) carried out in a foreign country (the Mexican Court sits within the territory of Mexico). Second, the Mexican Proceeding is governed by the Concurso Law, which (x) governs the insolvency of merchants (see id. at art. 1); (y) subjects the assets, liabilities and business affairs of the debtor to judicial supervision, including the allowance of claims and approval of a restructuring plan (see id. at arts. 7, 17, 20, 21, 42, 75, 81, 165, 178 through 196, and 339 through 342); and (z) has the stated purpose of reorganizing or liquidating insolvent businesses (see id. at arts 2 and 3).

65.     Finally, the Concurso Judgment specifies that it is a "Judgment of Commercial Insolvency with Preapproved Restructuring Plan" (*Sentencia de Concurso Mercantil con Plan de Restructura Previo*). Concurso Judgment heading of pages 2-39.

66.     As a result of the foregoing, bankruptcy courts have previously recognized that proceedings commenced under the Concurso Law qualify as "foreign proceedings" entitled to protection under title 11. See, e.g., In re Corporación Durango S.A.B. de C.V., Case No. 08-13911 (RDD) (Bankr. S.D.N.Y. Dec. 11, 2008) (recognizing a concurso proceeding in Mexico as a foreign main proceeding); In re Garcia Avila, 296 B.R. 95, 107-09 (Bankr. S.D.N.Y. 2003) (noting, among other things, that Mexico's Concurso Law (i) treated all creditors and interest holders justly, (ii) protected United States creditors against prejudice and inconvenience in processing their claims, (iii) prevented preferential and fraudulent distributions, and (iv) provided a scheme governing the distribution of the estate to secured, administrative, other priority and unsecured creditors).

67.     In addition, the Mexican Proceeding qualifies as a "foreign main proceeding," which is defined in section 1502(4) of the Bankruptcy Code as "a foreign proceeding pending in the country where the debtor has the center of its main interests."  See 11 U.S.C. § 1502(4).

68.     Although the Bankruptcy Code does not provide a conclusive test for determining a debtor's "center of main interests," it does provide that the debtor's "registered office" is presumed to be the center of its main interests.  <u>See</u> 11 U.S.C. § 1516(c); <u>see also</u> 8 COLLIER ON BANKRUPTCY ¶ 1516.03 (noting that the term "registered office" refers to the place of incorporation or the equivalent for an entity that is not a natural person); <u>In re Artimm, S.r.l.</u>, 335 B.R. at 159 (holding that debtor's center of main interests was Rome, the location of its registered office).  Metrofinanciera's registered office is located in Monterrey, Mexico.

69.     Moreover, such presumption is supported by the fact that Metrofinanciera maintains its corporate offices and most important administrative functions in Monterrey, Mexico, making Monterrey its principal place of business.  <u>See</u> <u>In re Tri-Continental Exch. Ltd.</u>, 349 B.R. 627, 634 (Bankr. E.D. Cal. 2006) (equating center of main interests with principal place of business).  Finally, all of Metrofinanciera's operations, including all of its branches, employees, and customers are located in Mexico.

70.     For all of the reasons set forth above, the Mexican Proceeding is, and should be recognized as, a foreign main proceeding.

**B.     *José Angel Amaro Is a Person Within the Meaning of Section 1517(a)(2) of the Bankruptcy Code***

71.     The second requirement for recognition of a foreign proceeding is that the foreign representative applying for recognition be a person or body.  <u>See</u> 11 U.S.C. § 1517(a)(2).  This chapter 15 case was commenced by Mr. José Angel Amaro, an individual who serves as Director of Finance of the Debtor.  An individual clearly constitutes a "person" under section 101(41) of the Bankruptcy Code.  Accordingly, Mr. Amaro is a person within the meaning of section 1517(a)(2).

**C.**     ***The Petition Meets the Requirements of Section 1515 of the Bankruptcy Code***

72.     The third and final requirement for recognition is that the petition satisfy the requirements of section 1515 of the Bankruptcy Code.  See 11 U.S.C. § 1517(a)(3).  Here, each such requirement has been met.  As an initial matter, this Petition is accompanied by the Concurso Judgment, which establishes the commencement and existence of the Mexican Proceedings.  See Exhibit C and Exhibit D to the Sepúlveda Declaration.

73.     Further, Mr. Amaro fits well within the definition of foreign representative.  The term "foreign representative" is defined in section 101(24) of the Bankruptcy Code as:

> [A] person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).[12]

74.     Under the Concurso Law, a debtor remains in possession of its assets and is entitled to continue to operate its business.  Indeed, the Concurso Law is clear that unless the "conciliador" requests the exceptional remedy of removal (*desapoderamiento*), the management of the enterprise remains in control.  See Article 74 of the Concurso Law. As a result, the Debtor, as debtor in possession, is the person "authorized" to reorganize the debtor under the Concurso Law.  In addition, the reorganized Debtor is authorized to implement the Convenio under the

---

[12]     The definition of "foreign representative" was amended in 2005 as follows (italicized text representing additions, and stricken text representing deletions):

> *The term* "foreign representative" means ~~duly selected trustee, administrator, or other representative of an estate in a foreign proceeding~~ *a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.*

See 2 COLLIER ON BANKRUPTCY ¶ 101.24.

Convenio Order.  For both of these reasons, the Debtor is the "foreign representative" within the meaning of section 101(24).

75.     Here, the Debtor's board of directors has taken the further step of authorizing Mr. Amaro, the Director of Finance of the Debtor, to commence these proceedings on its behalf and to act as the foreign representative, as evidenced by the resolution attached as Exhibit A and Exhibit B to the Amaro Declaration.  Courts have routinely recognized such appointments and the Court should do so here.  See, e.g., In re Corporación Durango S.A.B. de C.V., Case No. 08-13911 (RDD) (Bankr. S.D.N.Y. Dec. 11, 2008) (recognizing the general counsel and secretary to the Mexican debtor's board of directors as a valid foreign representative); In re Bd. of Dirs. of Hopewell, 275 BR. 699, 707 (S.D.N.Y. 2002) (interpreting prior section 101(24) and noting that "nothing in the statute requires a court appointment," and holding that company's board of directors qualified as foreign representative); In re Bd. of Directors of Telecom Argentina S.A., No. 05-17811(BRL), 2006 WL 686867, at *21 (Bankr. S.D.N.Y. Feb. 24, 2006) (holding same); Netia Holdings, 277 B.R. at 587 n.76 (holding same); In re Kingscroft Ins. Co. Ltd., 138 BR. 121, 124 (Bankr. S.D. Fla. 1992) (same).

76.     The fact that neither Mr. Amaro nor the Debtor was "appointed" by a court order to serve as foreign representative is of no consequence.  Neither section 101(24) nor chapter 15 of the Bankruptcy Code requires foreign representatives to be appointed by foreign courts. See, e.g., In re Bd. of Dirs. of Hopewell, 275 BR. 699, 707 (S.D.N.Y. 2002) (interpreting prior version of section 101(24) of the Bankruptcy  Code and stressing that "nothing in the statute requires a court appointment").  Rather, section 101(24) simply requires that such representative be "authorized" to administer the reorganization or the liquidation of the debtor's assets or affairs in the foreign proceeding.  See 11 U.S.C. § 101(24).  That is certainly the case here.

77.     Finally, in accordance with section 1515(c) of the Bankruptcy Code, the Amaro Declaration contains a statement identifying the Mexican Proceeding as the only foreign main proceeding currently pending with respect to Metrofinanciera.

78.     For all of the reasons set forth above and in the Verified Petition, all of the requirements of section 1517(a) are satisfied and, thus, entry of an order recognizing the Mexican Proceeding as a foreign main proceeding is proper.

## IX.     Upon Recognition of the Mexican Proceeding, the Debtor Is Entitled to Relief under 11 U.S.C. § 1520

79.     Section 1520 of the Bankruptcy Code sets forth a series of statutory protections that apply automatically upon the entry of an order recognizing a foreign main proceeding (see 11 U.S.C. § 1520) including the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to Metrofinanciera and to Metrofinanciera's property that is within the territorial jurisdiction of the United States.  Accordingly, if and when the Court enters an order recognizing the Mexican Proceeding as a foreign main proceeding, the protections set forth in section 1520 of the Bankruptcy Code should automatically apply to Metrofinanciera.

## X.     A Temporary Restraining Order and Preliminary Injunction Enjoining Collection Actions against Metrofinanciera in the United States Pending the Court's Ruling on the Verified Petition Should be Granted[13]

80.     The Bankruptcy Code provides for interim provisional relief, available upon the request of the foreign representative, where such relief is "urgently needed to protect the assets of the debtor or the interests of creditors," during the period between the filing of a chapter 15 petition and hearing on recognition.  11 U.S.C. § 1519(a).  Such interim relief is appropriate here.  Metrofinanciera needs immediate protection against collection actions in the United States

---

[13]     The arguments and legal analysis in this section are consistent with and conforms to the analysis set forth in the TRO Motion, but to the extent there are any inconsistencies, the TRO Motion shall control.

to maintain the status quo pending the Court's ruling on the Verified Petition and the motion to implement the Convenio.  Such relief will also ensure that, should the court grant the relief requested in these proceedings, the confirmed Convenio and the distributions thereunder will be implemented in an orderly and efficient manner and under the supervision of a single court— either the court overseeing the Mexican Proceeding or this Court.  Further, interim injunctive relief will ensure that Metrofinanciera receives the full benefit of its fresh start if and when the Mexican Proceeding is recognized by the Court.  Finally, granting the relief requested herein promotes judicial economy, as all U.S. actions will be subject to the automatic stay by operation of law should the Mexican Proceeding be recognized.

81.     Section 1519(a) of the Bankruptcy Code authorizes the Court to protect the value of, and stay execution against, the debtor's assets, including by application of other provisions of the Bankruptcy Code such as the automatic stay pursuant to section 362.  Section 1519(a) provides in pertinent part:

> From the time of filing a petition for recognition until the court rules on the petition, the court may, at the request of the foreign representative, where relief is urgently needed to protect the assets of the debtor or the interests of the creditors, grant relief of a provisional nature, including –

(1)     staying execution against the debtor's assets;

. . . .

(3)     any relief referred to in paragraph (3), (4), or (7) of section 1521(a).

11 U.S.C. § 1519(a)(1) and (3).

82.     Section 1521(a)(7) of the Bankruptcy Code provides that the court may grant "any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a)."  11 U.S.C. § 1521(a)(7).  Accordingly, imposition of the automatic stay pursuant to section 362(a)(1) of the Bankruptcy Code on a provisional basis is

available under section 1519(a)(3) of the Bankruptcy Code.  See e.g., In re Pro-Fit Holdings, Ltd., 391 B.R. 850, 855, 865-66 (Bankr. C.D. Cal. 2008) (entering an order pursuant to section 1519 of the Bankruptcy Code that section 362 applies on a provisional basis to the debtor's chapter 15 cases with respect to the debtor's U.S. assets pending the court's ruling on the application for recognition of the debtor's foreign proceedings as a "foreign main proceeding"). Section 362(a)(1) of the Bankruptcy Code enjoins:

> the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title

11 U.S.C. § 362(a)(1).

83.     Relief is also appropriate pursuant to section 105(a) of the Bankruptcy Code, which authorizes the Court to "issue any order necessary or appropriate to carry out the provisions of [title 11]."  11 U.S.C. § 105(a).  Section 105(a) of the Bankruptcy Code assures "the bankruptcy courts' power to take whatever action is appropriate and necessary in aid of the exercise of their jurisdiction."  2 COLLIER ON BANKRUPTCY ¶ 105.01 (15th ed. rev. 2006).

84.     The circumstances in this case warrant an imposition of a provisional stay and injunction of the commencement or continuation of collection actions against Metrofinanciera, including actions in respect to the Perpetual Notes, during the time between the filing of the Verified Petition and the Court's ruling on that petition.  As explained in more detail below, recognition of the Mexican Proceeding will likely be granted and the Petitioner will be authorized to implement and enforce the Convenio in the United States.  Collection actions against the Debtor in the United States pending the Court's ruling on recognition, however, will upset the fair and equitable distribution scheme provided under the Convenio and severely hinder the Debtor's reorganization efforts by causing delay, possible confusion and definite

inefficiencies.  Accordingly, unless such collection actions are temporarily enjoined, the Debtor

will be irreparably harmed.  In contrast, injunctive relief requested here will not harm the

Debtor's creditors.  The Petitioner merely seeks to preserve the status quo, and only for a short

period of time – until the Court rules on the Verified Petition.  The TRO Motion should be

granted.

### A.    *The Procedural Requirements for Injunctive Relief Are Satisfied*

85.    Section 1519(e) of the Bankruptcy Code applies the same standard, procedures,

and limitations applicable to an injunction to relief granted under section 1519 of the Bankruptcy

Code.[14]  *See* 11 U.S.C. § 1519(e).  A party seeking a preliminary injunction in the Fifth Circuit

must comply with the four-factor test set forth in Rule 65 of the Federal Rules of Civil

Procedure, made applicable by Bankruptcy Rule 7065.  The four factors are:  (1) substantial

likelihood of success on the merits; (2) substantial threat that the plaintiff will suffer irreparable

injury; (3) the threatened injury outweighs any harm the injunction might cause the defendant;

and (4) the injunction is in the public interest.  Women's Med. Ctr. v. Bell, 248 F.3d 411, 419

n.15 (5th Cir. 2001); Hoover v. Morales, 164 F.3d 221, 224 (5th Cir. 1998).  All four elements

are satisfied here.

### (i)    **Success on the Merits Is Likely**

86.    In order to establish a likelihood of success on the merits, Metrofinanciera must

establish that the Mexican Proceeding will likely be recognized as a "foreign main proceeding"

---

[14]    At least one court has held, however, that chapter 15 debtors are not required to bring an adversary
proceeding in order to obtain application of the automatic stay on an interim basis during the "gap period" between
the filing of their petition for recognition of foreign proceedings and the bankruptcy court's ruling on recognition
pursuant to section 1519 of the Bankruptcy Code.  See In re Pro-Fit Holdings, Ltd., 391 B.R. at 860-61 (holding that
while the prerequisites for obtaining injunctive relief specified in section 1519(e) apply to relief "staying execution
against the debtor's assets" provided under section 1519(a)(1), section 1519(e) does not apply to the imposition of
the automatic stay on an interim basis pursuant to section 1519(a)(3)).

pursuant to sections 1515 and 1517 of the Bankruptcy Code.[15]  As explained above and more

fully in the Verified Petition and TRO Motion, Metrofinanciera believes that it can convincingly

meet this test.  The Mexican Proceeding is a foreign main proceeding because (1) the Mexican

Proceeding is a foreign main proceeding within the meaning of section 1502 of the Bankruptcy

Code, (2) the Petitioner applying for recognition is a person or body, and (3) the Verified Petition

meets the requirements of section 1515 of the Bankruptcy Code.  11 U.S.C. § 1517(a).

<blockquote>

**(ii)    Metrofinanciera Will Face Irreparable Harm Absent the Requested Relief**

</blockquote>

87.    The Petitioner has filed the Verified Petition seeking recognition of the Mexican

Proceeding so that the confirmed Convenio may be enforced and implemented in the United

States.  Once the Mexican Proceeding is recognized, certain statutory protections, including the

automatic stay under section 362(a) of the Bankruptcy Code, will automatically apply pursuant

to section 1520 of the Bankruptcy.  Thus, upon recognition, all of the Debtor's creditors,

including BNYM and all of the holders of Perpetual Notes, will be prohibited from commencing

any collection action against the Debtor in the United States.  Pending the Court's ruling on

recognition, however, no such stay is in effect, and BNYM and the Holders of Perpetual Notes

may commence collection actions against the Debtor in New York courts pursuant to the

remedies provided in the Indenture.  See Indenture §§ 5.3, 5.4, 5.6, 5.11 and 12.14.

88.    If creditors are permitted to commence collection actions pending the Court's

ruling on recognition, the Debtor will suffer irreparable harm.  Absent the relief requested herein,

the Debtor could be forced to address claims in a piecemeal fashion, which will result in

unnecessary delay, confusion and inefficiencies.  In re Atlas Shipping A/S, 404 B.R. 726, 734

---

[15]      The Fifth Circuit employs a sliding scale when analyzing the degree of "success on the merits" a movant must demonstrate to justify injunctive relief.  Where the other factors weigh in favor of an injunction, as they do here, a showing of some likelihood of success on the merits is enough to justify temporary injunctive relief. Productos Carnic, S.A. v. Central Am. Beef & Seafood Trading Co., 621 F.2d 683, 686 (5th Cir. 1980).

(Bankr. S.D.N.Y. 2009) ("[T]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding.").  The Debtor also will waste limited and valuable resources litigating claims that will only be stayed by operation of law if  the Mexican Proceeding is recognized as a foreign main proceeding.  See 11 U.S.C. § 1520(a).  Further, the Debtor's ability to implement its Convenio and fairly distribute its assets to all of its creditors will be compromised if creditors are permitted to file collection actions in New York notwithstanding the  provisions of the Convenio.   Finally, litigation in the United States will be particularly burdensome given the Debtor is a Mexican company that has no presence in New York.

### (iii)    Non-Moving Parties are Not Likely to be Harmed

89.    In addition to the foregoing, the balance of harm tilts strongly in Metrofinanciera's favor.  On the one hand, Metrofinanciera's restructuring could be jeopardized if relief is not granted.  On the other, if Metrofinanciara is not entitled to relief, Metrofinanciera's creditors will suffer, at most, a short delay in commencing actions pending the outcome of a hearing regarding the Verified Petition.  Moreover, the Convenio has been confirmed in Mexico and is binding on all creditors, including the holders of Perpetual Notes.  Among other things, BNYM filed a proof of claim in the Mexican Proceeding, which was allowed in the amount of US$100 million, and chose not to object to the Convenio despite having the legal right to do so. Metrofinanciera's creditors can suffer no legitimate harm if they are prevented from filing collection actions that do nothing more than circumvent the terms of a legally binding Convenio. Finally, as noted above, the relief requested herein is no different than that which will be provided upon recognition of the Mexican Proceeding as a foreign main proceeding.  The maintenance of the status quo will not create any undue hardship or burden to creditors or

parties-in-interest, and any burden or hardship that may be imposed is outweighed by the

benefits of the relief requested.

**(iv)     Interim Injunctive Relief Is Consistent with U.S. Public Policy**

90.     Finally, approval of the relief requested herein is consistent with the public policy

of the United States.  Indeed, the relief requested herein is consistent with international comity,

which is regularly applied to foreign bankruptcy proceedings.  "American courts have long

recognized the need to extend comity to foreign bankruptcy proceedings,' because '[t]he

equitable and orderly distribution of a debtor's property requires assembling all claims against

the limited assets in a single proceeding; if all creditors could not be bound, a plan of

reorganization would fail.'"  In re Atlas Shipping A/S, 404 B.R. at 734.  The requested relief will

allow for the equitable and orderly distribution of the Debtor's estate because it maintains the

status quo pending this Court's decision on whether or not to recognize the Mexican Proceeding

and implement the Convenio.

91.     Provisional injunctive relief will also promote speedy and economic

administration of the Debtor's bankruptcy estate.  See In re Nixon Machinery Co., 27 B.R. 871,

873 (Bankr. E.D. Tenn. 1983) (a paramount consideration is the speedy and economic

administration of the bankruptcy estate).  As explained above, the Debtor has already confirmed

the Convenio in Mexico, and its efforts should be legally enforced in the United States.

92.     Furthermore, the injunctive relief requested herein promotes a fundamental goal

of United States bankruptcy laws – a financial "fresh start" for the reorganized debtor.  The

United States Supreme Court explained that the goal of the bankruptcy laws is to give the debtor

"a new opportunity in life and a clear field for future effort, unhampered by the pressure and

discouragement of preexisting debt."  Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934).  This

goal will be accomplished by enjoining the Debtor's creditors from commencing collection

actions against the Debtor in the United States while the Court's ruling on recognition is pending.  Such relief will allow Metrofinanciera to fully implement the Convenio, which an overwhelming majority of Metrofinanciera's creditors supported and to which no holder of Perpetual Notes objected (or vetoed), and focus on operating its reorganized business without fear of being sued in U.S. courts on account of prepetition debt.

### B.     *The Requirements for a Temporary Restraining Order Are Satisfied*

93.     The facts presented here also satisfy the requirements under Rule 65 of the Federal Rules of Civil Procedure (made applicable hereto by Rule 7065 of the Federal Rules of Bankruptcy Procedure) for a temporary restraining order pending hearing on the Petitioner's request for a preliminary injunction.  A temporary restraining order is properly granted to preserve the status quo and prevent immediate and irreparable injury pending a hearing upon a motion for a preliminary injunction.  See 13 James Wm. Moore et al., Moore's Federal Practice ¶¶ 65.30 and 65.36[1] (3d ed. 1997).

94.     A temporary restraining order should be granted if the elements for a preliminary injunction have been satisfied and the court determines that immediate and irreparable injury, loss, or damage will result to the Petitioner before the adverse party can be heard in opposition. See Fed. R. Bankr. P. 7065; Fed. R. Civ. P. 65(b); Smith v. Tarrant County Coll. Dist., 670 F.Supp.2d 534, 536-37 (N.D. Tex. 2009).

95.     The facts here warrant the imposition of a temporary restraining order because as set forth above, Metrofinanciera will be immediately and irreparably harmed if its creditors are allowed to commence collection actions in respect to the Perpetual Notes, which constitute prepetition debt discharged by the Convenio, prior to the date of hearing on the preliminary injunctive relief requested herein.

**XI.**  **Additional Assistance to Implement the Convenio in the United States is Authorized under Chapter 15 of the Bankruptcy Code and the Principles of Comity[16]**

    **A.**  *Additional Assistance Is Authorized under Section 1507 of the Bankruptcy Code*

96.   Chapter 15 of the Bankruptcy Code incorporates and implements the UNCITRAL Model Law.  In the Matter of Condor Insurance Ltd., 601 F.3d at 321; see also In the Matter of Ran,  607 F.3d at 1020; 8 COLLIER ON BANKRUPTCY ¶ 1501.01.  The purpose of chapter 15, and the Model Law on which it is based, is to provide effective mechanisms for dealing with insolvency cases involving more than one country.  See 8 COLLIER ON BANKRUPTCY ¶ 1501.01. Section 1501 of the Bankruptcy Code expressly states that the purpose of chapter 15 is to "further cooperation between the U.S. courts, parties in U.S. bankruptcy proceedings and foreign insolvency courts and authorities, as well as promote 'greater legal certainty,' 'fair and efficient administration of cross-border insolvencies that protects the interests of all creditors,' 'protection and maximization of the value of the debtor's assets,' and 'facilitation of the rescue of financially troubled businesses.'"  In the Matter of Condor Insurance Ltd., 601 F.3d at 324 (quoting 11 U.S.C. § 1501).

97.   Due to its international origins, chapter 15 is interpreted in coordination with the interpretation given by other countries that have adopted it as internal law to promote a uniform and coordinated and legal regime for cross-border insolvency cases.  See 11 U.S.C. § 1508 ("[i]n interpreting this chapter, the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions."); see also H.R. Rep. No. 109-31, 1st Sess. 106 (2005) ("[Chapter 15] incorporates the Model Law on Cross-Border Insolvency to encourage cooperation between the

---

[16]   The arguments and legal analysis in this section are consistent with and conforms to the analysis set forth in the Motion for Additional Assistance, but to the extent there are any inconsistencies, the Motion for Additional Assistance shall control.

United States and foreign countries with respect to transaction insolvency cases"). Mexico is among the countries that have adopted the Model Law. Thus, the Concurso Law incorporates the Model Law.

98.     Chapter 15 of the Bankruptcy Code provides courts with authority to assist foreign representatives once a foreign proceeding has been recognized. In the Matter of Condor Insurance Ltd., 601 F.3d at 325. In addition to the relief provided in sections 1519-1521, courts are authorized to provide "additional assistance" to a foreign representative under chapter 15 or under other laws of the United States, subject to limitations stated elsewhere in chapter 15. 11 U.S.C. § 1507(a); see In the Matter of Condor Insurance Ltd., 601 F.3d at 325 ("[A]s a catch-all, under section 1507 the court has authority to provide additional assistance to a foreign representative subject to the restrictions elsewhere in the Chapter."). Section 1507 was enacted by Congress in recognition that chapter 15 may not anticipate all of the types of relief that a foreign representative may require and which would otherwise be available to the foreign representative. H.R. Rep. No. 109-31, 109th Cong., 1st Sess. 109 (2005).

99.     In determining whether additional assistance is proper, courts must consider "whether such additional assistance, consistent with the principles of comity, will reasonably assure":

> (1)     just treatment of all holders of claims against or interests in the debtor's property;
>
> (2)     protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
>
> (3)     prevention of preferential or fraudulent dispositions of property of the debtor;
>
> (4)     distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

(5)    if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b).

100.    Section 1507(b) of the Bankruptcy Code embodies the protections previously contained in former section 304(c), predecessor to chapter 15, subject to a slight rearrangement to relocate "comity" from the listed factors to the introduction.  See 11 U.S.C. § 304, repealed by Pub. L. No. 109-8, § 802(d)(3) (2005).  "[T]he legislative history confirms that Congress expected courts to interpret [section 1507] consistently with prior law under § 304."  In re Atlas Shipping A/S, 404 B.R. at 741.  Under former section 304, comity was considered "by far the most important factor."  In re Artimm, S.r.L., 335 B.R. at 161.

### B.    *Post-Recognition Relief Is Guided by Principles of Comity*

101.    Chapter 15 contemplates that courts should be guided by principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief.  In re Atlas Shipping A/S, 404 B.R. at 738 (pursuant to the guiding principles of chapter 15, post-recognition relief "is largely discretionary and turns on subjective factors that embody principles of comity"); see H.R. Rep. No. 109-31, 1st Sess. 109 ("Although the case law construing section 304 makes it clear that comity is the central consideration, its physical placement as one of six factors in subsection (c) of section 304 is misleading, since those factors are essentially elements of the grounds for granting comity.  Therefore, in subsection [(b)] of [section 1507], comity is raised to the introductory language to make it clear that it is the central concept to be addressed.").  Indeed, section 1509 of the Bankruptcy Code requires that if the court grants recognition under section 1517, it "shall grant comity or cooperation to the foreign representative."  11 U.S.C. § 1509(b)(3); see Micron Tech., Inc. v. Qimonda AG (In re Qimonda AG Bankruptcy Litig.), Case Nos. 1:10cv26, 1:10cv27, 1:10cv28,

2010 WL 2680286 at *12 (E.D. Va. July 2, 2010) (quoting <u>DIRECTV, Inc.</u> v. <u>Rawlins</u>, 523 F.3d 318, 325 (4th Cir. 2008)) ("the word 'shall' connotes that 'Congress clearly did not manifest an intent to confer . . . discretion.'").

102.    Comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." <u>In re Artimm, S.r.L.</u>, 335 B.R. at 161 (quoting <u>Hilton</u> v. <u>Guyot</u>, 159 U.S. 113, 163-64, 16 S. Ct. 139 (1895)).  "Comity takes into account the interests of the United States, the interests of the foreign states or states involved, and the mutual interests of the family of nations in just and efficiently functioning rules of international law." <u>Id.</u>  "Deference to foreign insolvency proceedings will often facilitate the distribution of the debtor's assets in an equitable, orderly, efficient and systematic manner, rather than in a haphazard, erratic or piecemeal fashion." <u>Id.</u>

103.    The Supreme Court decision in <u>Canada Southern Railway Company</u> clearly articulates the principles of comity.  Canadian railroad bonds were held by citizens of New York and payable in New York City.  The Canadian railroad that had issued such bonds defaulted, and requested that the bondholders accept a "scheme of arrangement" under which the railroad would issue new bonds with reduced terms in exchange for the old bonds.  This scheme was approved by large majorities of the holders of each issue of bonds and was enacted into law by the Canadian Parliament as binding on all holders of the bonds at issue.  Certain New York bondholders, who had not voted on this scheme nor participated in the selection of the committee that proposed the scheme, sued on their original bonds in New York.  The Canadian company

defended by asserting that the scheme had redefined its obligations and was binding upon the U.S. parties.

104.    The Court held that the scheme bound the New York bondholders, and that their suit could not be maintained.  109 U.S. at 539-40.  The Court premised its decision on the idea that the creditors' reasonable expectations should include the possibility that the laws of the issuer's home country might affect their legal rights.

> [E]very person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government, affecting the powers and obligations of the corporation with which he voluntarily contracts, as the known and established policy of that government authorizes. To all intents and purposes, he submits his contract with the corporation to such a policy of the foreign government, and whatever is done by that government in furtherance of that policy, which binds those in like situation with himself, who are subjects of the government, in respect to the operation and effect of their contracts with the corporation, will necessarily bind him. He is conclusively presumed to have contracted with a view to such laws of that government, because the corporation must of necessity be controlled by them, and it has no power to contract with a view to any other laws with which they are not in entire harmony.

Id. at 537-38.

105.    Although the United States had no national bankruptcy laws at the time, the Court explicitly wrote in terms of a bankruptcy discharge, saying "anything done at the legal home of the corporation, under the authority of such laws, which discharges it from liability there, discharges it everywhere."  Id. at 538.  "Unless all parties in interest, wherever they reside, can be bound by the arrangement which it is sought to have legalized, the scheme may fail.  All home creditors can be bound.  What is needed is to bind those who are abroad.  Under these circumstances the true spirit of international comity requires that schemes of this character legalized at home, should be recognized in other countries."  Id. at 539.

106.    Recently, the United States Bankruptcy Court for the Southern District of New York reached a similar conclusion in a chapter 15 case.  In re Atlas Shipping A/S, 404 B.R. 726.

In <u>Atlas Shipping</u>, the debtor commenced an insolvency proceeding in Denmark and filed a chapter 15 petition in New York.  After the U.S. bankruptcy court recognized the Danish proceeding as a foreign main proceeding, the foreign representative asked such court to dissolve certain attachments on the debtor's assets granted by New York courts and to turn over the attached assets to the Danish bankruptcy trustee.  The foreign representative noted that under Danish law attachments were dissolved as a matter of law upon the filing of an insolvency proceeding.  The attaching creditors countered that the U.S. court could not grant the relief requested because section 1521(a)(7) expressly provides that a court could not grant any relief provided for in sections 522, 544, 545, 547, 548, 550 and 724(a) of the Bankruptcy Code in a chapter 15 case.  11 U.S.C. § 1521(a)(7).

107.    The court granted the foreign representative the relief it sought, dissolved the attachment and ordered the turnover of funds.  First, the court noted that "the equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail."  <u>Id.</u> at 733 (quoting <u>Vitrix S.S. Co., S.A. v. Salen Dry Cargo A.B.</u>, 825 F.2d 713-14 (2nd Cir. 1987)).  Next, the court concluded that it did not need to invoke the avoidance powers contained in the Bankruptcy Code to dissolve the attachments and turnover assets; rather, it merely needed to give effect, as a matter of comity, to Danish insolvency law in the United States.  Finally, the court indicated that comity should be afforded foreign insolvency proceedings unless doing so violated fundamental U.S. policies.

108.    <u>Atlas Shipping A/S</u> reflects the long standing legal principal that comity should be afforded to foreign proceedings as long as "the foreign court had proper jurisdiction and enforcement does not prejudice the rights of the United States citizen or violate domestic public

policy." Finanz AG Zurich v. Banco Economico S.A., 192 F.3d 240, 246 (2d Cir. 1999); see

also Ecoban Fin. Ltd. v. Grupo Acerero del Norte, S.A. de C.V., 108 F. Supp. 2d 349, 351-52

(S.D.N.Y. 2000) ("Comity is particularly appropriate and important with respect to foreign

bankruptcy proceedings, where equitable principles demand that all claims against a debtor's

limited assets be addressed in a single proceeding."); In re Ephedra Prods. Liab. Litig., 349 B.R.

333, 335-37 (S.D.N.Y 2006) (recognizing and enforcing claims resolution procedure ordered by

an Ontario court even though the procedure arguably deprived parties of the constitutional right

to a jury trial).  Further, the public policy exception to applying comity is difficult to establish,

limited to the most fundamental policies of the United States and rarely used.  Micron Tech.,

Inc., 2010 WL 2680286 at *14 ("Congress's use of the world 'manifestly,' as a qualifier to

'public policy,' substantially limits the scope of the exception. . . . and restricts [it] to the most

fundamental policies of the United States.")..

　　　　109.　　Courts have granted comity to Mexican insolvency proceedings.  See, e.g.,

JPMorgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V., 412 F.3d 418, 428 (2d Cir.

2005) (deferring to Mexican bankruptcy proceedings on international comity grounds because

"[n]othing in the record . . . suggests that the actions taken by the Mexican bankruptcy court are

not approved or allowed by American law."); Ecoban Fin. Ltd., 108 F. Supp. 2d at 350-55

(granting comity to Mexican insolvency proceeding on the grounds that it generally "resemble[s]

an American Chapter 11 reorganization" and that "Mexican law does not violate fundamental

principles of procedural fairness, or the public policy of . . . the United States.").  At least one

court has specifically found the Concurso Law to satisfy all the requirements of international

comity and former code section 304(c):

　　　　　　　The Debtors' Mexican bankruptcy proceedings easily meet [comity and
　　　　　　　section 304(c)].  Article 290 of the [Concurso Law] expressly provides

> that "foreign creditors shall have the same rights as Mexican creditors in relation to the commencement of a proceeding in this State and the participation pursuant to this act." Similarly, the [Concurso Law] permits all creditors, including American creditors, the opportunity to file claims, (see [Concurso Law], Art. 125), litigate disputes before the Mexican court, (id., Arts. 128-34), and appeal adverse determinations. (Id., Arts. 135-44.) . . . The [Concurso Law] also incorporates a highly structured process for achieving a consensual plan. Once a case is recognized by the Mexican court as a business reorganization, the case enters a "conciliation" stage for a maximum of 365 days. (Id., Art. 145.) The court appoints a conciliator charged, *inter alia,* with the task of mediating between the debtor and its creditors and proposing a plan of reorganization. (Id., Art. 148.) The debtor is obligated to cooperate with the conciliator. (Id., Art. 150.) The plan must be approved by Recognized Creditors holding over 50% of the aggregate amount of (1) the allowed unsecured debt and the (2) the allowed amount of the special privilege and secured debt that sign the plan agreement. (See id., Art. 157.) All unsecured creditors must receive *pro rata* treatment. (Id., Art. 222.) Creditors indicate their assent by signing the plan agreement. If the debtor and the requisite majority of creditors approve the agreement, the conciliator submits it to the judge for his approval. (Id.) In order to approve the plan, the judge must decide that it meets the applicable requirements of the [Concurso Law], and "is not inconsistent with any public policy provision." (Id., Art. 164.) An approved plan binds the debtor and the unsecured creditors, (id., Art. 165), and discharges the unpaid portion of the debt. (Tr. 81.) If the plan is rejected by the creditors or the court, the debtors will be liquidated. (Tr. 80; see [Concurso Law], Art. 167.)

In re Garcia Avila, 296 B.R. 95 at 108-09. Indeed, the Mexican Proceeding and the Convenio confirmed thereunder are patently consistent with the hallmarks of a chapter 11 reorganization under the Bankruptcy Code

### C. *Principles of Comity in Chapter 15 Cases Support Entry of an Order Granting the Additional Assistance Requested in this Chapter 15 Case*

110. Giving effect to the Convenio Order in the United States, permitting the Convenio to be implemented in the United States and enjoining creditors from collecting prepetition debts in U.S. courts are all consistent with the principles of comity and therefore proper under section 1507 of the Bankruptcy Code. As a threshold matter, it is undisputed that the Mexican Court has competent jurisdiction. Metrofinanciera is a Mexican company that operates solely in Mexico.

An overwhelming majority of Metrofinanciera's creditors are located in Mexico, and Metrofinanciera has virtually no assets outside of Mexico.

111.    In addition, BNYM, the indenture trustee for the Perpetual Notes, including those held by U.S. investors, has voluntarily submitted itself to the Mexican Court's jurisdiction. BNYM participated in the Mexican Proceeding by seeking recognition and acknowledgement of claims related to the Perpetual Notes in the Mexican Court.  Moreover, by voluntarily acquiring Perpetual Notes issued by a Mexican company, the holders of Perpetual Notes impliedly subjected themselves to Mexican law.

> (i)    **The Mexican Proceeding Is Akin to a Chapter 11 Proceeding under the Bankruptcy Code, and Therefore, Is Consistent with the Fundamental Principles of Procedural Fairness and Public Policy of the United States**

112.    The Mexican Proceeding is also clearly consistent with (i) fundamental principles of procedural fairness, (ii) the public policy of the United States, and (iii) chapter 11 proceedings occurring under the Bankruptcy Code.  See Finanz AG Zurich, 192 F.3d at 246; In re Metcalfe & Mansfield Alternative Investments, 421 B.R. at 697.  BNYM was given a legitimate opportunity to make its claim, which it did and which the Mexican Court allowed substantially in the amount sought.  BNYM was also afforded the opportunity to object to (veto) the Convenio, which it declined to exercise.  Nothing in the Concurso Law or the Mexican Proceeding limited or impeded the ability of U.S. holders of Perpetual Notes to participate in the process, or favored Mexican creditors over U.S. creditors.  Indeed, the treatment of similarly situated Mexican creditors and U.S. creditors is identical.  The Convenio simply makes no distinction between the two.

      **(ii)**      **The Convenio Is Also Consistent with the Fundamental Principles of Procedural Fairness and Public Policy of the United States**

113.     Further, the Convenio is the Mexican law equivalent and has all the earmarks of a plan of reorganization.  Much like a chapter 11 plan, the Convenio is a product of arms' length negotiations among the various constituencies in Metrofinanciera's restructuring.  As a prepackaged plan of reorganization, the Convenio reflects the consensual agreement that was reached among the various constituencies after such negotiations.  In addition, the Convenio, like a chapter 11 plan, must be supported by the Debtor's creditors to be confirmed; is subject to objection by any creditor; and is not effective unless confirmed by the court in a judicial process that permits all to be heard.  Put simply, creditors in Mexican proceedings have similar rights to those of creditors in a chapter 11 and the Convenio is the result of a process very similar to the chapter 11 plan process.

114.     In this particular case, the Convenio was ultimately accepted by 68.5% of the Debtor's qualifying outstanding indebtedness, and the court presiding over the Mexican Proceedings reviewed the terms of the Convenio and confirmed the Convenio only after finding that it met all requirements of the Concurso Law and did not contain any provision contrary to Mexican public order.

115.     In addition, the distributions under the Convenio closely adhere to the absolute priority rule and are fully consistent with chapter 11:  the Secured Claims will either be reinstated and unimpaired or paid from the proceeds of their collateral; the Securitization Claims and Other Unsecured Claims will be satisfied through the issuance of equity in and notes against the reorganized Debtor on a *pro rata* basis; old equity will be substantially extinguished (i.e, it will be diluted to represent approximately 0.00023% of the total equity in the reorganized Debtor) and priority and administrative claims will be paid in full.  Creditors in each class of

claims stand to receive identical treatment as other members of their respective class, and U.S. creditors are treated exactly the same as Mexican creditors holding Other Unsecured Claims.

116.    Moreover, under the Convenio, Metrofinanciera's creditors (when converted to shareholders) have the right to appoint new management, which they have already done.  This feature is consistent with section 1129(a)(5) of the Bankruptcy Code, and will assure that the reorganized Debtor is under the control of its creditors, not old equity.  Indeed, old equity will have no management role in the Debtor on a going forward basis.

117.    Further, although Securitization Claims[17] and Other Unsecured Claims (both arguably unsecured creditors) are treated differently in the Convenio, such differences are the result of an arms' length settlement and are consistent with both section 1123(b)(3) (which permits plans to include settlements of claims) and section 1129(b) (which permits discrimination among creditors for valid business reasons) of the Bankruptcy Code.  In short, the Debtor (under prior management) diverted funds owed to Securitization Creditors for other corporate purposes.  Holders of Securitization Claims argued that such diversion should give rise to a constructive trust upon the Debtor's assets providing them with priority over Other Unsecured Creditors.  Holders of Other Unsecured Claims disagreed, arguing, among other things, that constructive trusts were not recognized under Mexican law.  Ultimately, the parties compromised by providing holders of Securitization Claims with a mix of more debt and less equity in the reorganized Debtor than the Other Unsecured Creditors.  This was a reasonable

---

[17]    Notably, the nature of Securitization Claims is vastly different from that of Other Unsecured Claims. Contrary to Other Unsecured Claims, which are based on notes and other debt instruments issued directly by Metrofinanciera, Securitization Claims are, in essence, breach of contract and tort claims arising from Metrofinanciera's securitization of mortgages.  Metrofinanciera securitizes most of its mortgage loans by transferring them to trusts that sell trust certificates to Mexican investors.  Metrofinanciera services these trusts by receiving payments directly from the mortgagors and making payments to the trusts.  The Securitization Creditors are Mexican investors of such trusts serviced by Metrofinanciera, and their claims arise from Metrofinanciera's diversion of funds payable to these trusts for general corporate purposes.

result, and avoided substantial litigation that could have jeopardized the Debtor's reorganization and is, without question, consistent with chapter 11 and other U.S. law.

### (iii)   Additional Assistance Requested Herein Promotes Fundamental Policies of the Bankruptcy Code

118.   Finally, the additional assistance requested herein promotes fundamental policies of U.S. bankruptcy laws.  First, the additional assistance will provide the Debtor with the possibility of a financial "fresh start."  The United States Supreme Court explained that the goal of the bankruptcy laws is to give the debtor "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt."  Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934).  This goal will be accomplished here by giving comity to the Convenio Order as requested in this Motion.

119.   Although Metrofinanciera's obligations with respect to the Perpetual Notes will be satisfied in full by the Exchange, Metrofinanciera may nonetheless be subject to costly unjustified litigation in the United States in connection to the Perpetual Notes absent the relief requested herein.  The Indenture explicitly provides that Metrofinanciera and BNYM submit to the jurisdiction of New York state courts (and federal courts sitting in the Borough of Manhattan) regarding any suits, actions and proceedings brought in connection to the Perpetual Notes.  Indenture, § 12.14.  Accordingly, all holders of Perpetual Notes could commence actions against Metrofinanciera in New York notwithstanding the consideration they are to receive in satisfaction of their claims under the confirmed Convenio.

120.   The Mexican Court cannot effectively or efficiently prevent creditors (especially U.S. creditors) from commencing lawsuits in the United States on account of the Indenture and the Perpetual Notes, and, absent the relief requested herein, there is no guarantee that rulings of the Mexican Court will be valid in the Untied States.  By granting the relief requested herein, this

Court can provide Metrofinanciera with the certainty that its Convenio will be binding in the United States, thereby allowing Metrofinanciera to implement its creditor approved restructuring and focus on operating its reorganized business without the fear that it will be sued in U.S. courts on account of prepetition debt.

121.    Additional assistance will also "secure a prompt and effectual administration and settlement" of the Debtor's estate.  Katchen v. Landy, 382 U.S. 323, 328 (1966) (One of the "chief purpose of the bankruptcy laws is to 'to secure a prompt and effectual administration and settlement of the estate of all bankrupts within a limited period.'").  The confirmed Convenio is the product of a long reorganization process that is now in its final stages.  Once the Convenio is implemented, the administration and settlement of the Debtor's estate will be virtually complete and the estate will be fully administered.  Thus, granting the additional assistance requested herein – authorizing implementation of the Convenio in the United States – will promote the policy of quickly and efficiently administrating the bankruptcy estate.

### D.    *Enforcement of the Exchange Provided under the Convenio Is Also Authorized under 11 U.S.C. § 1521(b)*

122.    The Court may also aid the implementation of the Convenio by entering an order pursuant to section 1521(b) of the Bankruptcy Code.  Under section 1521(b) of the Bankruptcy Code, a foreign representative may be entrusted with "the distribution of all or part of the debtor's assets located in the United States."  11 U.S.C. § 1521(b).  Accordingly, if section 1521(b) relief is granted, distributions would be made pursuant to the laws and priority rules that apply in the Mexican Proceeding, i.e., the distribution scheme under the Convenio.

123.    While the interplay between the relief available under sections 1507 and 1521 is "far from clear," legislative history makes clear that Congress expected the courts to interpret these provisions consistently with prior law under section 304 of the Bankruptcy Code.  In re

Atlas Shipping A/S, 404 B.R. at 741 (citing H.R. Rep. No. 109-31, at 116 (2005) and Allan L.

Gropper, *Current Developments in Int'l Insolvency Law: A United States Perspective*, 15 J.

BANKR. L. & PRAC. 2, Art. 3, at 4 (Apr. 2006)).  As explained above, under former section 304,

comity was considered "by far the most important factor."  In re Artimm, S.r.L., 335 B.R. at 161.

Thus, section 1521(b) of the Bankruptcy Code, like section 1507(b), should be applied in

accordance to the principles of international comity.  Id. at 160 (analyzing under former section

304(c) but noting that the analysis would be "essentially the same" under section 1521(b)).

124.     Section 1521(b) relief is available if the interests of local creditors are

"sufficiently protected."  Id.; In re Atlas Shipping A/S, 404 B.R. at 740.  One court has described

"sufficient protection" as governed by the following three principles:  (1) "the just treatment of

all holders of claims against the bankruptcy estate"; (2) "the protection of U.S. claimants against

prejudice and inconvenience in the processing of claims in the [foreign] proceeding"; and (3)

"the distribution of proceeds of the [foreign] estate substantially in accordance with the order

prescribed by U.S. law."  In re Artimm, S.r.L., 335 B.R. at 160 (analyzing under section 304 of

the old Bankruptcy Code, predecessor to chapter 15, but noting that the analysis would be

"essentially the same" under section 1521(b)).  As explained above, each of the three principles

articulated in Atrimm are easily satisfied here and therefore, the Mexican Proceeding complies

with "due process" and "fair play."  Accordingly, the Court also has authority under section

1521(b) to authorize implementation of the Convenio with respect to BNYM and the holders of

Perpetual Notes.

## XII.     Need for the Securities Custodian to Expeditiously Implement the Exchange

125.     As described more fully in the Custodian Motion, a custodian in the United States

will enhance the ability to fully perform the obligations owed to holders of Perpetual Notes and

provide a mechanism for distributions.  Furthermore, use of a custodian will ensure that the

exchange occurs in the most expeditious manner and under the oversight of the Court.  That is, granting the Custodian Motion and providing related additional assistance will permit for the Exchange Securities to be transferred without any delay for the benefit of the BNYM and the holders of Perpetual Notes.

126.    The Custodian Motion shall seek an order from the Bankruptcy Court appointing Mr. Robert C. Pate, who has agreed, pursuant to written agreement (the "Securities Custodian Agreement") to serve as Metrofinanciera's custodian of the Exchange securities allocated for BNYM and/or the holders of Perpetual Notes under the Convenio (the "Securities Custodian") upon his approval and appointment by the Bankruptcy Court in the Chapter 15 proceeding, on the terms of Securities Custodian Agreement and the terms as provided from time to time by the Bankruptcy Court.

127.    The Motion will seek an order that the Securities Custodian shall be compensated in this position, subject in all things to (i) the terms of the Agreement; (ii) the terms of the order of the Bankruptcy Court entered with respect thereto from time to time;  (iii)  the obligations as provided in the Convenio; and  (iv) such other agreements between Metrofinanciera and the Securities Custodian.  The Motion shall seek in addition to the initial order that provides for the compensation of the Securities Custodian, the exculpation from liability for the Securities Custodian except for willful fraud, and provisions for maintaining, operating, and maintaining disbursements from the Securities Custodian accounts, including provisions for professional, accounting, or other services deemed reasonably necessary for the purpose of the duties of the Securities Custodian.   The Agreement with the Securities Custodian provides for a payment of an initial retainer of $10,000 U.S. to be held by the Securities Custodian in the United States and applied to the fees and costs incurred in connection with this Agreement and orders of the

Bankruptcy Court, and to compensate the Securities Custodian's for his performance if, as and when, appointed by the Bankruptcy Court as the Securities Custodian.   The Securities Custodian shall be compensated by Metrofinanciera at the hourly rate of $450.00 per hour and shall be reimbursed for all reasonable and necessary expenses.

128.    The Custodian Motion shall also seek an order providing for the handling, treatment, and distribution to the holders of this only debt issue not governed by Mexican law, to permit such holders to receive their distributions under the Metrofinanciera's court-approved plan of reorganization under Mexican insolvency law (as noted above, the Convenio provides that, in exchange for their claims, the holders, both Mexican holders and non-Mexican holders, of the Perpetual Notes will receive a mix of common stock in the reorganized Metrofinanciera, Subordinated Notes and Non-Subordinated Notes).

129.    In particular, unless and until order of the Bankruptcy Court provides for the appointment of the Securities Custodian, Mr. Pate shall render the services and work as requested from time to time by Metrofinanciera but shall not be the holder of any asset or distributable asset of Metrofinanciera other than the retainer paid for the initial services of the Securities Custodian, nor shall the Securities Custodian have any legal or equitable right to bring any actions for the benefit of any holder of any distributable interest of or from Metrofinanciera, all such rights being implemented, if at all, by the Bankruptcy Court's order appointing Pate as the Securities Custodian and providing for all rights of possession, handling, and distribution of any such distributable interests.

Dated: Corpus Christi, Texas
       August 30, 2010

          WHITE & CASE LLP

          /s/ Alan S. Gover
          Alan Shore Gover
          1155 Avenue of the Americas
          New York, New York 10036-2787
          Telephone: (212) 819-8200
          Facsimile:  (212) 354-8113

          Craig H. Averch
          Roberto J. Kampfner
          633 West Fifth Street, Suite 1900
          Los Angeles, California 90071-2007
          Telephone: (213) 620-7700
          Facsimile: (213) 452-2329

             -and-

          JORDAN, HYDEN, WOMBLE,
          CULBRETH & HOLZER, P.C.

          */s/ Shelby A. Jordan*
          Shelby A. Jordan
          500 North Shoreline Boulevard,
          Suite 900
          Corpus Christi, Texas 78471
          Telephone: (361) 884-5678
          Facsimile: (361) 888-5555

          *Attorneys for José Angel Amaro as*
          *Foreign Representative of*
          *Metrofinanciera*